UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


GARY L. VERDUCHI,[1]                    :
      Plaintiff,                     :
                                 :
      v.                              :        CA 05-388 T
                                :
MICHAEL J. ASTRUE,[2]                   :
COMMISSIONER OF SOCIAL SECURITY, :
      Defendant.                     :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

      This is an action for judicial review of the decision of the
Commissioner of Social Security ("the Commissioner"), denying
Disability Insurance Benefits ("DIB"), under § 205(g) of the Social
Security Act, as amended, 42 U.S.C. § 405(g) ("the Act").  Plaintiff
Gary J. Verduchi ("Plaintiff") has filed a motion to reverse or remand
the decision of the Commissioner.  Defendant Michael J. Astrue
("Defendant") has filed a motion for an order affirming the decision
of the Commissioner.  The motions have been referred to me for
preliminary review, findings, and recommended disposition pursuant to

---

     [1] In the Complaint, Plaintiff is identified as Gary L. Verduchi.
See Complaint (Document ("Doc.") #1).  In the rest of the record,
Plaintiff is identified as Gary J. Verduchi.  See, e.g., (R. at
80)("My name is Gary Joseph Verduchi.").  Hereafter, the Court
utilizes the spelling which appears in the record from the Social
Security Administration.

     [2] On February 12, 2007, Michael J. Astrue became the Commissioner
of Social Security.  Pursuant to Fed. R. Civ. P. 25(d)(1),
Commissioner Astrue is hereby substituted for Jo Anne B. Barnhart as
Defendant in this action.  See Fed. R. Civ. P. 25(d)(1) ("When a
public officer is a party to an action in his official capacity and
during its pendency dies, resigns, or otherwise ceases to hold office,
the action does not abate and the officer's successor is automatically
substituted as a party.  Proceedings following the substitution shall
be in the name of the substituted party ...."); see also 42 U.S.C. §
405(g) ("Any action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying the
office of Commissioner of Social Security or any vacancy in such
office.").

28 U.S.C. § 636(b)(1)(B).  For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff was not disabled from January 5, 1999, through October 28, 2004,[3] is supported by substantial evidence in the record and is free from legal error.  Accordingly, based on the following analysis, I recommend that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Document ("Doc.") #6) ("Motion to Affirm") be granted and that Plaintiff's Motion to Reverse without or, Alternatively, with a Remand for a Rehearing the Commissioner's Final Decision (Doc. #5) ("Motion to Reverse") be denied.

### Facts and Travel

Plaintiff was born on January 4, 1951, (R. at 97), and was fifty-three years old at the time of the decision by the Administrative Law Judge ("ALJ") which is the subject of this action, (R. at 294).  He attended school for twelve years and received a general equivalency diploma.  (R. at 813)  Since his late teens Plaintiff has worked in a family owned service station/garage.[4]  (R. at 110, 813, 868)  The business was owned by Plaintiff's father, (R. at 868), and upon the father's death around 1998, (R. at 429), it was willed to Plaintiff and his sister, Corrine O'Donnell, (R. at 458, 868, 891).  Plaintiff received sixty percent and his sister received forty percent of the business.  (R. at 868, 891)  Following his father's death, Plaintiff became the manager in addition to being a mechanic.  (R. at 880)

Plaintiff suffered a heart attack in 1995, (R. at 138), but returned to work after three months of rehabilitation, (R. at 824, 861).  He had a second, more severe heart attack on January 5, 1999.  (R. at 245, 480-81, 853)  Plaintiff testified that he never returned

---

[3] October 28, 2004, is the date of the decision by the Administrative Law Judge ("ALJ") denying Plaintiff's applications for Disability Insurance Benefits ("DIB").  (R. at 301)

[4] Plaintiff testified at the September 13, 2004, (R. at 852), hearing that the business stopped selling gasoline approximately five years earlier because "we couldn't afford to replace the tanks," (R. at 856).  Since that time the business was "just auto repair," (R. at 857), providing services such as brake and exhaust repairs and oil changes, (R. at 859).

to work thereafter.[5]  (R. at 867)

He filed an application for DIB on September 2, 1999, (R. at 117), alleging an inability to work since January 5, 1999, (R. at 109).  His application was denied initially and on reconsider- ation. (R. at 66, 75)  Plaintiff requested a hearing before an ALJ, and that hearing occurred on April 6, 2001, before ALJ Hugh S. Atkins ("ALJ Atkins").  (R. at 24)  On May 21, 2001, ALJ Atkins decided that Plaintiff was not disabled at step five of the well-known five-step sequential evaluation.  (R. at 30, 31)  Plaintiff requested review by the Appeals Council, (R. at 20), and the Appeals Council denied Plaintiff's request on August 9, 2002, (R. at 6, 326).  Plaintiff sought judicial review by filing an action in this Court.  On January 26, 2004, the Court issued an order, accepting a report and recommendation from this Magistrate Judge, (R. at 675-77), "that the matter be remanded to the Commissioner for 'further development of the medical and psychological evidence to resolve the degree of restriction stemming from Plaintiff's mental state,'" (R. at 677)(quoting Defendant's Motion for Entry of Judgment under Sentence Four of 42 U.S.C. 405(g) and Remand of the Matter to the Commissioner at 2).

In the interim, on November 20, 2001, Plaintiff filed a subsequent application for DIB, again alleging an onset date of January 5, 1999.  (R. at 363)  This application was also denied at both the initial and reconsideration levels.  (R. at 315, 320) Following a hearing before ALJ Martha H. Bower ("ALJ Bower"), ALJ Bower rendered an unfavorable decision on September 23, 2003.  (R. at 310)  Plaintiff sought review by the Appeals Council, which remanded the matter for additional administrative proceedings on August 27, 2004.  (R. at 313-14)

In remanding the case, the Appeals Council noted that Plaintiff's prior claim for benefits (filed on September 2, 1999) was still

---

[5] Plaintiff testified similarly at a prior hearing on July 14, 2003, before ALJ Martha H. Bower ("ALJ Bower").  (R. at 825)

pending at the district office following this Court's January 26, 2004, order.  (R. at 314)  Accordingly, the Appeals Council directed the ALJ "to associate the claim files and issue a new decision on the associated claims."  (Id.)

In compliance with this directive, ALJ Atkins conducted another administrative hearing on September 13, 2004.  (R. at 293, 852)  ALJ Atkins issued an unfavorable decision on October 28, 2004.  (R. at 301)  Plaintiff again sought review by the Appeals Council, (R. at 288), but on July 7, 2005, that body found no reason to assume jurisdiction and ALJ Atkins' unfavorable decision became the final decision of the Commissioner, (R. at 274).

Plaintiff filed the instant action on September 9, 2005.  See Docket.  The case was referred to this Magistrate Judge for a report and recommendation on December 20, 2005.  See id.  Plaintiff filed his Motion to Reverse on February 21, 2006, and Defendant filed his Motion to Affirm on March 21, 2006.  See id.

### Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff was not disabled after January 5, 1999, within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

### Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed de novo, the Commissioner's findings of fact, if supported by substantial evidence in the record,[6] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d

---

[6] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)); see also Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

765, 769 (1ˢᵗ Cir. 1999)("We must uphold the [Commissioner's] findings
... if a reasonable mind, reviewing the evidence in the record as a
whole, could accept it as adequate to support his conclusion.")(second
alteration in original)).  The Court does not reinterpret the evidence
or otherwise substitute its own judgment for that of the Commissioner.
Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d
148, 153 (1ˢᵗ Cir. 1989)).  "Indeed, the resolution of conflicts in the
evidence is for the Commissioner, not the courts."  Id. at 31 (citing
Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1ˢᵗ
Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct.
1420, 1426 (1971))).

### Law

To qualify for DIB, a claimant must meet certain insured status
requirements,[7] be younger than sixty-five years of age, file an
application for benefits, and be under a disability as defined by the
Act.  See 42 U.S.C. § 423(a).  The Act defines disability as the
"inability to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months ...."  42
U.S.C. § 423(d)(1)(A).  A claimant's impairment must be of such
severity that he is unable to perform his previous work or any other
kind of substantial gainful employment which exists in the national
economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination
of impairments is not severe if it does not significantly limit [a
claimant's] physical or mental ability to do basic work activities."[8]

---

[7] Plaintiff met the insured status requirements as of January 5,
1999, the alleged onset of his disability, and was insured through
October 28, 2004, the date of the decision by ALJ Atkins.  (R. at 75)

[8] Section 404.1521 describes "basic work activities" as "the
abilities and aptitudes necessary to do most jobs."  20 C.F.R. §
404.1521(b) (2006).  Examples of these include:

   (1) Physical functions such as walking, standing, sitting,
   lifting, pushing, pulling, reaching, carrying, or handling;
   (2) Capacities for seeing, hearing, and speaking;

20 C.F.R. § 404.1521(a) (2006).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a) (2006); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2290-91 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform her past relevant work; and (5) whether he remains capable of performing any work within the economy.  See 20 C.F.R. § 404.1520(b)-(g).  The evaluation may be terminated at any step.  See Seavey, 276 F.3d at 4.  "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

### ALJ's Decision

The ALJ decided this case at step one of the familiar sequential analysis.  He found that Plaintiff's work activity as a part-time paid service station sole-proprietor/manager constituted substantial gainful activity within the meaning of the regulations from January 1999 and continuing.  (R. at 300, 301)  As a consequence, the ALJ

---

(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.

found that Plaintiff was not disabled at any time since January 1999
due to the performance of substantial gainful activity prior to the
lapse of the twelve month period after the alleged onset of
disability. (Id.) Thus, the ALJ concluded that Plaintiff was not
under a disability as defined in the Act. (Id.)

**Errors Claimed**

Plaintiff argues 1) that the ALJ erred in calculating Plaintiff's
earnings and 2) that the ALJ's credibility findings are inadequate.
See Memorandum in Support of Plaintiff's Motion to Reverse without a
Remand for a Rehearing or, Alternatively, with a Remand for a
Rehearing the Commissioner's Final Decision ("Plaintiff's Mem.")[9] at 6,
12.[10]

**Discussion**

**I. Calculation of Plaintiff's Earnings**

**A.  Plaintiff's Work Related Activities**

Plaintiff testified that he never went back to work after his
second heart attack in 1999. (R. at 859, 867)  However, he told the
ALJ that he stops by the business "maybe twice a week," (R. at 864),
around noon or one o'clock and will "hang around an hour or two while
[his sister and the mechanic] have lunch," (R. at 870).  Plaintiff
denied engaging in any management services during the one or two hours
that he is at the business. (R. at 870)   Rather, he indicated that
he answers the phone and talks to longtime customers. (Id.)
Plaintiff also stated that if there is a deposit to be dropped off at
the bank, he will drop it off on his way home. (R. at 870-71)

As for other contact with the business, Plaintiff related that

---

[9] Notwithstanding its title, Plaintiff's Mem. only requests
remand as relief.  See Plaintiff's Mem. at 14;

[10] The pages of Plaintiff's Mem. are unnumbered.  Plaintiff's
counsel is reminded that the Local Rules require that where a document
is more than one page in length, the pages shall be numbered at the
bottom center of each page.  DRI LR Cv 5(a)(3).  Plaintiff's counsel
is also reminded to use pinpoint citation when citing cases.  See
Plaintiff's Mem. at 13.

his sister calls him once or twice a month[11] and that she may ask about such matters as what she should charge for a certain job.  (R. at 871) However, Plaintiff added that he usually did not have the answer for her "because I have been away for awhile."  (Id.)  In response to a question from the ALJ as to what percentage Plaintiff thought he was contributing to management of the business by virtue of his visits and telephone conversations with his sister, Plaintiff responded: "Not much." (R. at 872)  When asked to give a percentage, he answered: "Maybe 10 percent."  (Id.)

### B.  Plaintiff's Earnings

Plaintiff testified at the September 13, 2004, hearing that the amount he receives from the business "always differs between $100, $200, $250 a week."[12]  (R. at 881)  After ALJ Atkins noted that Plaintiffs' earnings statement reflected (in round figures) annual earnings of $13,000 in 2000, $12,300 in 2001, and $11,000 in 2002, Plaintiff responded: "Well, some weeks it would be $100.  Some weeks it would be $300.  Depending on the week.  Every week was different." (R. at 881)

### C.  ALJ's Determination of Substantial Gainful Activity

ALJ Atkins noted that the evaluation guidelines for determining

---

[11] Plaintiff's sister seemingly contradicted this statement.  She testified that: "I'm very close to my brother, so we talk on the phone daily."  (R. at 883)

[12] At the April 6, 2001, hearing Plaintiff was also asked about his income:

Q.   What income do you have?

A.   The only income that I have is the Woodlawn Auto Service --

Q.   And what is that?

A.   -- which isn't much, maybe a hundred a week or something.

(R. at 44)  Plaintiff's actual reported earnings for 2001 averaged $236.81 per week ($12,314 ÷ 52 = $236.81); for 2000 they averaged $253.96 per week ($13,206 ÷ 52 = $253.96); and for 1999 they averaged $248.71 per week ($12,933 ÷ 52 = $248.71).  (R. at 429-30); see also n.16.

whether a self-employed person has engaged in substantial gainful activity are set forth in 20 C.F.R. § 404.1575.  (R. at 297)  He further noted that in making this determination there are three tests and that satisfaction of any one of the tests is sufficient.  (Id.)  After reviewing the

evidence, ALJ Atkins found that Plaintiff met the first test, (R. at 299), which is stated below:

> (i)   Test one: You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business.

20 C.F.R. § 404.1575(a)(2)(i); see also (R. at 297, 299, 301); Social Security Ruling ("SSR") 83-34, 1983 WL 31256, at *1 ("Work may be substantial even if it is performed on a part-time basis, or even if the individual does less, has less responsibility, or makes less income than in previous work.").

In reaching this conclusion, ALJ Atkins found that Plaintiff's "testimony as to his minimal managerial involvement in the family business to be clearly not credible given the inconsistencies in his testimony particularly as it relates to his business services and income ...."  (R. at 299)  ALJ Atkins cited the following inconsistencies.  Plaintiff's testimony that he goes to the business an average of twice a week was inconsistent with his own attorney's opening statement that Plaintiff "stops into the shop two or three times a week ...,"[13] (R. at 855); see also (R. at 295 n.1).  This testimony was also at odds with statements which Plaintiff made to treating and examining sources.  (R. at 300 n.15)  The record reflects that on the dates listed below Plaintiff made statements to medical

---

[13] Plaintiff argues that the statements are not inconsistent.  See Plaintiff's Reply to Defendant's Motion for an Order Affirming the Decision of the Commissioner ("Plaintiff's Reply") at 5-6.  Considered in isolation, the Court would tend to agree with Plaintiff.  However, when considered with all the other evidence which casts doubt on Plaintiff's testimony that he went to the business "maybe twice a week," (R. at 864), the Court finds that the ALJ's observation has at least some minimal validity.

providers which either contradict or cast doubt on his claim of going to the business only two times a week.

March 1, 1999: "He is only working three or four hours a day, but he is looking to retire[] completely and perhaps go on permanent disability."  (R. at 150)

July 7, 1999: "Pt. has a high stress rating due to work and he is in the process of a divorce."  (R. at 765)

September 2, 1999: "He is working three or four hours a day in the gas station."  (R. at 515)

February 7, 2000: "He is in the midst of a divorce presently and has virtually lost his family business.  He now works in a garage.  He was unable to get certification to do automobile inspections or pump gas."  (R. at 544)

March 15, 2001: "At the present time, he is limited with very easy fatigability [sic], and he is not able to put in a full day's work at his garage."[14]  (R. at 233)

February 28, 2003: "Pt notes that he is leaving his house more frequently to help his family members work in a garage."  (R. at 730)

April 29, 2003: "The pt states he is more involved in family activities.  He reports helping his family members around the family owned garage."  (R. at 739)

May 12, 2003:  "The pt reports an improvement in his mood (less sadness) and an increase in his social activities (going to the garage on a daily basis)[.]"[15]  (R. at 741)

ALJ Atkins noted that Plaintiff's sister, who allegedly handles

---

[14] Three weeks after this notation that he was not able to put in "a full day's work," (R. at 233), Plaintiff was asked by ALJ Atkins at the first hearing if he ever went to the garage, (R. at 38). Plaintiff answered: "I pop in maybe twice a week."  (Id.)  When asked how long he spent there, Plaintiff stated: "A half hour, 45 minutes." (R. at 40)

[15] Despite this report of daily attendance at the garage, only two months later, at the July 14, 2003, hearing before ALJ Bower, Plaintiff he testified: "I go in, it's, every week is different, Your Honor.  I'll go in maybe twice, the most three times a week, depending how I feel."  (R. at 812)

ninety percent of the management duties, was unpaid and that she
lacked experience in the automotive field.  (R. at 295)   He pointed
out that she had previously been employed as a youth group director, a
"totally unrelated prior occupation ...."  (R. at 295 n.4)  ALJ Atkins
specifically rejected Plaintiff's suggestion that his sister was
familiar with the business because she had been around it her whole
life while coming in on Saturdays.  (R. at 295 n.4); see also (R. at
881, 890).

    Most significantly in the view of this Court, ALJ Atkins pointed
out that Plaintiff's earnings records show similar yearly income both
before and after his alleged onset of disability.[16]  (R. at 299)   ALJ
Atkins correctly noted that this was consistent with "'presumptive'
substantial gainful activity," (id.), which Plaintiff had failed to
rebut,[17] (id.).

---

    [16] Plaintiff's earnings for 1996 through 2003 are shown below.

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|------|------|------|------|------|------|------|------|
| $13,000 | $13,000 | $15,366 | $12,933 | $13,206 | $12,314 | $11,008 | $11,598 |

(R. at 429-30)

    [17] This apparent discrepancy was also noted by ALJ Bower at the
July 14, 2003, hearing.

    Q    Okay.  The other question, I want to go back to your
         earnings for the last few years because when I look at
         your earnings you actually earned more in 2001 than
         you earned in '90, in 2000, excuse me, you earned more
         in 2000 than you earned the previous year.  And it
         looks like you're earning consistently between $12,000
         and $15,000.  **It doesn't look like your earnings have
         changed at all since you stopped working, can you
         explain that**?

    A    Well, because it's not, I don't get paid hourly or
         weekly, I just get paid by the profit that they have,
         whatever's there, you know what I'm saying?

    Q    But you were working previously as a mechanic?

    A    Up until '99, yeah, every day.

11

ALJ Atkins also found that Plaintiff had attempted to conceal his ongoing work activity by noting in his disability reports and other documents supporting his application that he has engaged in "No" work since his allege onset of disability.  (R. at 299 n.10)(citing exhibits, presumably in particular R. at 109, 370, 436, 452).  The record supports ALJ Atkins' statement that Plaintiff repeatedly affirmed that he had not worked after January 5, 1999.

Lastly, ALJ Atkins plainly indicated that he did not believe the testimony of Plaintiff's sister, Ms. O'Donnell.  (R. at 299 n.11)("It is simply not believable that Ms. O'Donnell would place her 'trust' in pricing jobs solely in the hands of an employee mechanic without any regular ongoing involvement from the claimant given his 30+ years of experience in the business.").  Indeed, it appears that ALJ Atkins had doubts as to whether Ms. O'Donnell was, in fact, unpaid.  He wrote the word "unpaid" in bold, (R. at 295), followed immediately by a footnote containing Plaintiff's explanation as to why he did not pay his sister a salary.  The phraseology used in the footnote suggests that ALJ Atkins was skeptical of the claim that Ms. O'Donnell was unpaid

---

Q    So they're paying, you're getting just as much money
     now for not working as you were getting while you were
     working?

A    Well, I get, because I'm the owner, that's why I get
     it.

Q    But --

A    Whether I work or not, I get --

ALJ: Okay, I'd like to see the, the weekly records starting
     in '90, starting in 2001, the alleged onset date, I'd
     like to see the records showing what the employees,
     the, sister and the other employee are making, and any-
     thing that the Claimant is making.  I just want to make
     sure I can tie that down.

(R. at 836-37)(bold added).

because she did not need the money.[18]  Later in the decision, ALJ
Atkins stated that "[s]he claims that it doesn't matter that she is
unpaid since she runs the business in order to prevent her brother
from having the same fate as their father while 'giving back' by
carrying on a long-standing family tradition."  (R. at 296)  Again,
ALJ Atkins's use of the phrase "she claims" suggests that ALJ Atkins
did not accept her testimony that she was uncompensated.

　　　Although not cited by ALJ Atkins, there is other evidence in the
record which casts doubt on the testimony of Plaintiff and his sister
at the September 13, 2004, hearing that she was unpaid.  The
transcript of the July 14, 2003, hearing reflects the following
exchange between ALJ Bower and Plaintiff which appears to contradict
the testimony which he and his sister
subsequently gave in September of 2004.

> Q   Yeah, how do they maintain their records, get paid?
>
> A   Well, I, I pay my, my sister gets paid cash, and my
>     other guy gets paid cash, Steven.
>
> Q   Okay.
>
> A   But he, he's on the, he's on the books.  My
>     sister's is more like a charity type thing.
>
> Q   Okay.
>
> A   She's not on the books.

---

[18] The footnote stated:

The claimant stated that he does not pay his sister a salary
for her management duties because "she doesn't need the money"
since her husband has a successful painting business.  He,
also, noted that his sister owns a 40% interest in the
business which will only be realized if the business is sold
which evidently both he and his sister would be interested in
someday.  However, the claimant conceded that the worth of the
business is questionable given the fact that "no one wants it"
since it's in a "bad neighborhood."

(R. at 295 n.3)

13

(R. at 837)[19]

Thus, for the reasons set forth above this Court finds that substantial evidence supports the determination of ALJ Atkins that the testimony of Plaintiff and Ms. O'Donnell at the September 13, 2004, hearing was not credible.  For the same reasons, the Court also finds that substantial evidence supports ALJ Atkins' finding that Plaintiff provided significant services to the business and that he received a substantial income from it.

After making these findings, ALJ Atkins proceeded to determine that Plaintiff continued to work as a part-time paid service station sole-proprietor/manager at a substantial gainful activity level within twelve months of the alleged onset of disability in January of 1999. (R. at 300)  In making this determination, he noted that Plaintiff earned an average income of well over $810 per month (using the "primary guideline amount" for the year 2004) for the entire period of work and that this was presumptive of gainful activity during the period from January 1999 and continuing.  (Id.)  ALJ Atkins concluded that this work activity "clearly involved significant physical or mental activities for pay or profit (20 CFR [§] 404.1573)."  Id.

Given that Plaintiff's income from the business consistently exceeded $11,000 per year throughout the period of claimed disability, (R. at 430), and that $11,000 divided by 12 months results in monthly income of approximately $917 per month ($11,000 ÷ 12 months = $916.67), the Court finds that substantial evidence supports ALJ Atkins' finding that Plaintiff's work activity as a part-time service station sole-proprietor/manager constitutes substantial gainful activity within the meaning of the Regulations from January 1999 and continuing.  (R. at 300) Consequently, substantial evidence also supports ALJ Atkins' ultimate conclusion that Plaintiff was not disabled "due to the performance of substantial gainful activity prior to the lapse of the 12 month period after his alleged onset of

---

[19] At the September 13, 2004, hearing Plaintiff contradicted his earlier testimony, stating "I don't pay my sister."  (R. at 863) Plaintiff also agreed that "the only people that make money out of this business is the mechanic and you."  (Id.)

14

disability and continuing (Social Security Ruling 82-52)," (R. at
301), and that Plaintiff was not under a disability at any time
through the date of ALJ Atkins' decision, (id.).

**D.   Sister's Unpaid Help**

Plaintiff contends that ALJ Atkins erred in not subtracting from
Plaintiff's earnings the value of his sister's unpaid help in the
business.  See Plaintiff's Mem. at 6-9.  In support of this argument
Plaintiff cites C.F.R. § 404.1575 and SSR 83-34.  In relevant part, 20
C.F.R. § 404.1575(c) states:

> Once we determine your net income, we deduct the reasonable
> value of any significant amount of unpaid help furnished by
> your spouse, children, or others.  Miscellaneous duties that
> ordinarily would not have commercial value would not be
> considered significant.

20 C.F.R. § 404.1575(c)(1).  ALJ Atkins explained that he did not
subtract the value of Ms. O'Donnell's services because her "unpaid
help" to the family business consisted of "miscellaneous duties
carried on in connection with her general activities as a member of
the household ...."  (R. at 299 n.12)(quoting SSR 83-34, at *5).

Plaintiff argues that for this exception to apply the help must
be miscellaneous in nature and tied to the individual's relationship
to the claimant as a relative or friend.  See Plaintiff's Mem. at 7.
As Ms. O'Donnell is Plaintiff's sister, it appears that Plaintiff's
complaint is directed towards the ALJ's description of her help as
"miscellaneous duties carried on in connection with her general
activities as a member of the household ...,"  (R. at 299
n.12)(quoting SSR 83-34, at *5).  Plaintiff notes that SSR 83-34 gives
as an example of such unpaid help "a farmer's children feed a small
flock of chickens or tend a home garden," SSR 83-34, at *5; see also
Plaintiff's Mem. at 7, and suggests that ALJ Atkins found in effect
"that Plaintiff's sister's near full-time work represented no greater
value than that of a child feeding chickens ...," Plaintiff's Mem. at
8.  Plaintiff also argues that "the ALJ failed to carry out his burden
under Social Security Ruling 83-34 to document the full measure and
nature of the unpaid help ...."  Id. at 9.  Regarding this latter

15

argument, Plaintiff quotes the portion of the SSR which immediately follows the example about the farmer's children feeding chickens:

> On the other hand, where the help furnished is of a nature to which commercial value would ordinarily be assigned, the following type of information should be in the file:  the name of the helping individual and this person's relationship to the impaired self-employed individual; the reason why unpaid help was furnished; a full account of the services rendered, the amount of time furnished, and how long the arrangement existed; an estimate of the reasonable value of the services, on the basis of prevailing pay for that type of work in the community; and, if the help was furnished by a spouse or by a child under age 18, an explanation of how the previous pattern of such individual's activities was affected, if at all.[20]

SSR 83-34, at *5.

Plaintiff's argument that ALJ Atkins did properly apply the regulations fails to take into consideration that Ms. O'Donnell owns forty percent of the business.  (R. at 891)  Under questioning by ALJ Atkins, she appeared to acknowledge that she was providing her services both to help her brother and to protect her forty percent interest.

Q   Well, you need to preserve your 40 percent.

A   Yeah.  Sure.

Q   Because if you weren't there to manage it, your 40 percent would disappear, wouldn't it?  With your brother not able to manage it?  So it's kind of a defensive maneuver you're doing by managing this.  Preserving your 40 percent interest.  Making sure it's there.  Because he doesn't want to manage anymore, and it would just -- it would just crumble away, wouldn't it?  It would just deteriorate.

A   Yeah.  I guess so.  I mean, what --

---

[20] The Court notes parenthetically that except for "an estimate of the reasonable value of the services, on the basis of prevailing pay for that type of work in the community ...," SSR 83-34, at *5, the record contains all of the other applicable information, see (R. at 811-12, 856-98, especially 860, 884).  Thus, Plaintiff's contention that the record also lacks this other information is rejected.  See Plaintiff's Mem. at 12.

16

Q   So you say you're doing it for your brother, but
    there's also an element that you're doing it to
preserve your 40 percent.

A   Yeah.  I guess both.

(R. at 895-96)

Thus, the "unpaid" services provided by Ms. O'Donnell, a part
owner of the business, are clearly distinguishable from the unpaid
services provided by Mr. W., the elevator operator in the other
example of unpaid help stated in the SSR.[21]  In that example, Mr. W.
had no ownership interest in the candy and cigarette counter business
to which he donated an hour of his time each day.  For unpaid help
like that provided in the example by Mr. W., the SSR instructs that an
amount equal to the prevailing local wage rate in the community for

---

[21] The other example stated in SSR 83-84 of unpaid help is set
forth below:

Mr. J., a former automobile mechanic, became disabled as a
result of an accident.  Through the services of a
rehabilitation agency, he opened a candy and cigarette counter
in January 1982 in the lobby of an office building.  He ran
the business as a self-employed individual and was able to
serve customers, make change, and perform the various other
duties connected with the business.  However, once a day he
needed help in restocking the shelves.  Mr. W., an elevator
operator in the same building, donated an hour of his time
each day, without pay, to perform this service for the
claimant.  In estimating the amount to be deducted from net
income, the prevailing local rate of $3.25 an hour for this
type of help was used.  Hence, although Mr. J.'s net
reportable income for income tax purposes was $3,900 a year
(or an average of $325 a month), his income was found not
substantial because the deduction of approximately $65 per
month for unpaid help resulted in "countable income" which was
not more than $300 per month for 1982; *and, development
established that Mr. J.'s livelihood from the vending stand
was not comparable either to his own past personal standard of
livelihood or to the community standard of livelihood* as
explained in subsection 2.c. below.

SSR 83-34, at *5 (italics added).

such help should be deducted from Mr. J.'s net reportable income for tax purposes. See SSR 83-34, at *5.

Given Ms. O'Donnell's ownership interest in the business, the ALJ's conclusion that no estimate of the reasonable value of her services is necessary to determine Plaintiff's net income has a reasonable basis. It appears that the ALJ equated their common ownership of the business as the equivalent of the "household" relationship referenced in the SSR. While the unpaid help allegedly provided by Plaintiff's sister would appear to be more substantial than the unpaid help provided by the farmer's children in the first example, it also does not correspond to the unpaid help provided by Mr. W. in the second example because of Ms. O'Donnell's sibling relationship to Plaintiff and her financial interest in the business. Furthermore, ALJ Atkins did not accept the testimony of Plaintiff and his sister that Plaintiff had only a *de minimis* managerial role in the operation of the station. (R. at 299) ALJ Atkins also had reason to doubt whether Ms. O'Donnell was in fact "unpaid" given Plaintiff's statements at the July 14, 2003, hearing that his "sister gets paid cash ...," (R. at 837), and that she was "not on the books," (id.). Therefore, substantial evidence supports ALJ Atkins' decision not to assign a value to her services and to subtract that amount from Plaintiff's net income. Plaintiff's claim of legal error on this point should be rejected.

Moreover, even if ALJ Atkins should have assigned some value to Ms. O'Donnell's services (after taking into consideration and adjusting for her forty percent ownership interest in the business), his failure to do so is harmless error. Contrary to Plaintiff's assertion, deducting for Ms. O'Donnell's unpaid help would not have proven that Plaintiff was not engaged in substantial gainful activity. See Plaintiff's Mem. at 11. This is because even if Plaintiff's "countable income" from the business does not average more than the applicable amount shown in the Guidelines, as a self-employed individual he will still have substantial income from a business if the livelihood which derives from the business is comparable to that

which he had before becoming disabled.   See SSR 83-84, at *4.[22]   ALJ
Atkins in his discussion of the applicable Regulations for determining
substantial income specifically noted this fact.[23]   (R. at 298) The
need to consider whether a self-employed claimant's livelihood from a
business is comparable to his own past personal standard livelihood is
also specifically referenced in the second example of unpaid help in
the SSR.   See Discussion supra at 18  n.21 (italicized lines).

    It is clear that Plaintiff has continued to derive a livelihood
from the business which is comparable to that which he had before
becoming disabled.   See Discussion supra at 13 n.15.   In fact, his
yearly income from the business since January 1, 1999, exceeds his
annual earnings for every year during the period from 1987 to 1995.[24]
(R. at 428-30)   Thus, Plaintiff's assertion that deducting the value
of his sister's unpaid help would have proven that he was not engaged
in substantial gainful activity, see Plaintiff's Mem. at 11, is

---

[22] SSR 83-34 states in relevant part:

> **Even if "countable income" from the business does not average
> more than the applicable amount shown in the Guidelines, a
> self-employed individual will have substantial income from a
> business if the livelihood which he or she derives from the
> business is comparable to that which he or she had before
> becoming disabled,** or is comparable to that of unimpaired
> self-employed individuals in his or her community engaged in
> the same or similar businesses as their means of livelihood.

SSR 83-84, at *4 (bold added).

[23] ALJ Atkins wrote: "If the business was the individual's sole
means of livelihood for a number of years before he became disabled,
and the individual continues to receive a comparable livelihood from
it after becoming disabled, his income will generally be considered
'substantial' (Social Security Ruling 83-34)."   (R. at 298)

[24] Plaintiff's earnings during the period 1988 to 1995 are set
forth below:

| 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|------|------|------|------|------|------|------|------|
| $9,275 | $9,100 | $10,400 | $10,400 | $10,400 | $10,600 | $10,400 | $6,850 |

(R. at 428-29)

19

incorrect.  The Regulations make plain that "[i]f the self-employed person's average monthly 'countable income' does not exceed the amount shown for the particular calendar year in the Earnings Guidelines, it is necessary to consider whether his or her livelihood from the business is comparable to either that which he or she had before becoming disabled, or to that of unimpaired self-employed persons in the community engaged in the same or similar businesses as their means of livelihood."  SSR 83-34, at *7.  Applying this ruling to Plaintiff's circumstance results in a finding that he engaged in substantial gainful activity within the meaning of the Regulations.  Thus, even if ALJ Atkins made some deduction for the value of the sister's unpaid help which she rendered solely because of her relationship to Plaintiff (and not because of her part ownership interest), it would not have altered ALJ Atkins's finding of substantial gainful activity.  See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)(noting that, although an ALJ's opinion may be vulnerable, "[n]o principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Plaintiff also argues, relatedly, that substantial evidence does not support the ALJ's finding that Plaintiff's sister's help only amounted to miscellaneous tasks.  See Plaintiff's Mem. at 10.  Plaintiff asserts that the ALJ's disbelief of Ms. O'Donnell's testimony that she "would place her 'trust' in pricing jobs solely in the hands of an employee mechanic without any regular ongoing involvement from the claimant given his 30+ years of experience in the business," id. (quoting R. at 299), is conclusory and that substantial evidence does not support this finding, see id.  In support of this assertion, Plaintiff contends that ALJ Atkins failed to consider: 1) that up until May or June 2004 the mechanic employed by the business had been there for ten years, (R. at 857-58); 2) that although the new mechanic had been working at the business for only four months, he had previously owned his own garage, (R. at 858); 3) that Plaintiff's sister was raised in a household of mechanics and was therefore

20

familiar with the daily workings of a repair shop, (R. at 859); and 4) that she had begun working at the station one or two days a week beginning in June of 1998, (R. at 881, 883).  See Plaintiff's Mem. at 10.  Plaintiff complains that the ALJ failed to discuss, "or even mention, these vital factors in concluding that Plaintiff's sister could not possibly set rates."  Id. at 11.

An ALJ is not required to address every piece of evidence in the administrative record.  Lord v. Apfel, 114 F.Supp.2d 3, 13 (D.N.H. 2000).  Moreover, the determination of credibility issues and the resolution of evidentiary conflicts are responsibilities of the Commissioner, see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991), and the Court must show deference to the ALJ's findings on such matters, see Yongo v. Immigration & Naturalization Servs., 355 F.3d 27, 32 (1st Cir. 2004)("the ALJ, like any fact-finder who hears the witnesses, gets a lot of deference on credibility judgments"); Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence is entitled to deference, especially when supported by specific findings."); see also Suarez v. Secy of Health & Human Servs., 740 F.2d 1 (1st Cir. 1984)(stating that ALJ is "empowered to make credibility determinations and to resolve conflicting evidence").

Here the ALJ stated his reasons for discounting the testimony of Plaintiff and his sister regarding the extent of her management duties and the allegedly de minimus involvement of Plaintiff in the operation of the business.  Substantial evidence supports those reasons. Plaintiff's claim to the contrary should be rejected.

## II.  Adequacy of ALJ's Credibility Findings

Lastly, Plaintiff asserts that the ALJ's findings as to credibility are factually and legally inadequate.  See Plaintiff's Mem. at 12.  Plaintiff challenges the ALJ's finding that "the claimant has attempted to conceal his ongoing work activity ...."  Id. (quoting R. at 299).  The Court has examined the references cited by the ALJ and finds that they support his statement.

21

In addition, the Court has already cited other parts of the record which provide a reasonable basis for concluding that Plaintiff in his testimony attempted to minimize the extent of his involvement in the business.  The most persuasive evidence of this is the fact that Plaintiff's earnings remained relatively stable even after his alleged onset date of January 5, 1999.  Plaintiff argues that this "should surprise no one," Plaintiff's Reply to Defendant's Motion for an Order Affirming the Decision of the Commissioner ("Plaintiff's Reply") at 6, because the "gas station remained in the same place, performed the same services for the same demographic, and had the same number of employees," id.  The only difference was that "Plaintiff's sister had taken over management responsibilities .... Id.  However, the business previously had two mechanics (Plaintiff and the other mechanic), and Plaintiff did not devote himself exclusively to managerial tasks.  He indicated that he used to work twelve hours a day six days a week.[25]  (R. at 861)  Even accepting Plaintiff's argument that his sister now performs ninety percent of the management tasks, this would not explain why the earnings have remained stable if Plaintiff in fact only goes into the garage a couple of times a week and does nothing more than answer the telephone and talk with customers while his sister and the mechanic are at lunch.

**Summary**

The Court finds that the ALJ did not err in determining that it was unnecessary to assign a value to Plaintiff's sister's unpaid services because she owns forty percent of the business and the ALJ reasonably equated their common ownership as the equivalent of the "household" relationship referenced in SSR 83-34.  Additionally, substantial evidence supports the ALJ's determination that Plaintiff and his sister were not credible in claiming that she provides almost all of the managerial services for the business and that Plaintiff plays only a *de minimis* role.  The ALJ also had reason to doubt that

---

[25] Plaintiff testified at the September 13, 2004, hearing that after suffering his first heart attack he was out of work for about three months and "[t]hen I went back to 89, 90 hours a week."  (R. at 861)

Plaintiff's sister was in fact unpaid.  Moreover, even if the ALJ should have subtracted some amount for the sister's unpaid help, the error is harmless because Plaintiff would still be deemed to have engaged in substantial gainful activity by virtue of the fact that he continued to receive a comparable livelihood from the business after he become disabled.

## Conclusion

The Court finds that the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and is free from legal error.  Accordingly, I recommend that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
March 30, 2007